Good morning, Your Honors. Mr. Smith, we'll be glad to hear from you. Nicholas Smith on behalf of Appellant Nicholas Young. Your Honors, for almost six years, Appellant Young was the subject of a counterterrorism investigation. He served in law enforcement the entire time without incident. He had no criminal history. At no point during the six years of the investigation did Young ever speak to a person involved with a foreign terrorist organization. He never traveled to join a foreign terrorist organization and never attempted to. He never gave money to a foreign terrorist organization. At no point in the six years did Nicholas Young plan, aid, or commit an act of violence. Following four years of this investigation, one of the multiple undercover informants or agents assigned to follow Young over these years, Mo, told Young that he was interested in traveling to Syria, perhaps to join ISIS, the FTO. Young told him it's illegal to join a foreign terrorist organization. You'll get caught by customs. Get a job in America. Don't you know this is a gang of criminals in the Middle East who are lusting for power and money? Mo said he's inclined to go anyway, likely. But the investigation didn't end there. Undercover agents assumed control of Mo's email account and began emailing Young off and on, socially, for over a year. Ultimately, the undercover agents asked Mr. Young to send $245 in Google Play gift cards so that these agents, putatively in Syria, could communicate with people for recruitment purposes. The agents asked Mr. Young to send the gift cards several times without Mr. Young agreeing. Ultimately, he succumbed. Young was charged with attempted material support for a foreign terrorist organization. He raised the defense of entrapment. I think we're familiar with the facts and the charges against Mr. Young. You might want to move on in your time to address the legal issues. Absolutely, Your Honor. I just wanted to situate the court in the context of a rather long case. Our first objection to the trial court's order is related to the white supremacist materials, pictures and District Court permitted over 36 pieces of this evidence, highly inflammatory evidence, to be shown to a jury in a case that did not concern a hate crime. It's worth taking off some of these items because they were so inflammatory that the suggestion that this material was not harmless cannot be countenance. There were burning crosses shown to the jury during closing arguments. There were pictures of Adolf Hitler. There were pictures of stormtroopers marching. There were pictures... The challenge you've got, and just to focus, I know you want to talk about facts, I get that, but we're interested in the legal questions. The challenge that strikes me here is that your client is the one that put these things together. He's got a prayer list that includes Hitler and Osama bin Laden. He's got evidence of the Mufti of Jerusalem, who was somebody who put those things together, known for that basic idea. The challenge is that your client is the one that put them together. We can talk about the expert, which supported, in essence, the rationality of your client's own joining of these two ideologies. That's the challenge, it seems to me. Tell me why it is we ought to ignore your client's own decision to combine those two and try to artificially separate them. Your Honor, this court should not only ignore that suggestion, but it should positively find that the argument to the district court that the client put these two ideas together was a false misrepresentation made to the district court. There were several areas in which it was was one of those witnesses. Ian Campbell testified. Well, let's back up for a second. Now, don't back up. Go to Ian Campbell. Ian Campbell testified that 16 years before the federal investigation in this case, he attended a British National Party meeting with Mr. Young for a European racism class at George Mason University. At this meeting, 16 years before the investigation, of which Ian Campbell remembered nothing else, he remembered one comment that Mr. Young allegedly said, quote, Right, but our job's not to question his credibility, right? That's the jury's job. That's absolutely right, Your Honor. But when the district court made the decision to find these materials relevant, it was represented to the district court that Mr. Young attended a neo-Nazi rally. That was false information provided to the district court. What was not in the district court was not informed was that Mr. Young attended a British National Party meeting for a European racism class with the knowledge of his college professor. That information was not given to the district court. During that conversation, he linked the two ideas, right? And I understand you want us to say, you know, this guy, Ian, he's a liar, right? But that's not really our job. But it's also not, it doesn't stand alone, right? I mean, that's the challenge. So Ian says that, that's fine. But it's added up with all these other things, right? Where he's no other things. There was this figure of the Grand Mufti of Jerusalem who the expert witness testified provided some sort of an earl ink between white supremacism and militant Islam. The only connection of Nicholas Young to the Grand Mufti of Jerusalem was a Facebook like on a Facebook page. If you look at the Wikipedia page for the Grand Mufti of Jerusalem, there are thousands and thousands of work that have nothing to do with the connection between But if, so if I conclude, but it sounds like what you're saying is if I don't disregard the facts, if I take the facts as I read them, then you would agree that that creates a real problem for you. That's why you're sort of fighting the facts. That if your client put these two things together, your prejudice and argument sort of goes away, right? I don't think it does go away, Your Honor, because we've got a cumulative argument. We've unfair prejudice outweighing whatever meager probative value there might be for these pieces of evidence. The court performed no Rule 403 balancing. There was no discretion exercise in deciding whether to admit 36 of these pieces. Perhaps it might have been justifiable. But it excluded some, correct? It excluded, let's put it this way. I don't have the specific number of pieces of evidence that were excluded in this category, but there was virtually more white supremacist evidence in this case than militant Islamic evidence in this case. And that's for a reason. Because the predisposition standard in this case required the government to prove a predisposition to support a foreign terrorist organization before 2010. Your Honors, at Dockett- Didn't the district court warn you several times about the timeline of your argument and what the government would have to go back in time to show in terms of predisposition? Your Honor, that is a representation, a suggestion that's made in the government's briefs. That's not accurate. At the beginning of the case in August 2016, we had filed multiple briefs with the district court indicating our position was the predisposition burden began in 2010. Because that's when Nicholas Young's first contact was had with an undercover agent. That's the Jacobson case. The district court gave no indication either way whether it had seen those suggestions in our initially decided to exclude certain categories of evidence that it went back during the trial and decided that 2010, because 2010 was the trigger date, certain categories of evidence that had been excluded would then be included. I don't think that's really a fair characterization of what Judge Brinkman said. She said, at this time, I'm not going to admit them. You may be, the government later, be able to show, and then I'll certainly consider it. So now we're talking about a separate category of evidence which includes lawfully owned firearms, et cetera, in Mr. Young's home. She said that the door might be open to those materials if the defense were to present Mr. Young as a completely pacific person who never dabbled. Right, but I think any time you have a motion in limine, just the way the trial process works, the court says, okay, these aren't going to come in, but that ruling's subject to change, depending on the foundation that's laid and how the evidence plays out. So I don't see how that argument works at this point for you. The court didn't categorically exclude. Judge Keenan, this court has held that when a district court makes a determination, there are three grounds to change a settled ruling. One is new facts are law. I think it's a hard stretch for you to say those are settled rulings. I mean, district court was pretty clear with caveats all the way through, this is all subject to change. Yes, Your Honor. But to get back to Judge Richardson's- Otherwise, how would you be able to conduct a trial? You haven't even heard the evidence yet. Your Honor, the judge was familiar with a discrete set of pieces of evidence that could possibly be included in trial. She was fully briefed on the issues surrounding those pieces of evidence. There was no new fact, law, or circumstance that would justify changing in the middle of trial, Your Honor. But just to get back to Judge Richardson's question, there is a route in which the result we're seeking in this case could be obtained, regardless of whether the facts are interpreted in this case to suggest that Mr. Young put the two ideas together. The warrant did not permit the seizure of these items. That's plain from the- Let's come back to that. One of the challenges of raising this many issues, I want to turn for a second and ask you about the obstruction charges. You raised and made a very persuasive Rule 29 motion. And I don't want to get to the merits of that quite yet. What I want to know is, in that, you sort of set forward both this foreseeability and nexus requirement that to decide those questions. So the jury instructions that you agreed to don't address either of those things, right? Either the foreseeability of Arthur Anderson or the nexus of Aguilar, right? The jury instructions just say, did knowingly obstruct. Yes. And Your Honor, we crafted a series of arguments and made them to the jury based on the basic standard that Your Honor just cited. So we said that one of the case agent on this case acknowledged that concrete evidence showed Mr. Young did not become aware of a grand jury investigation, an official proceeding, of himself until August 2016. That's fine. But what I'm saying is the jury instructions themselves, the ones that you agreed to, don't require him to know the official proceeding was taking place. That's the oddity here to me. That is the law, Your Honor. No, no. I agree it's the law. Don't be confused, right? That's Arthur Anderson. But you agreed to jury instructions that didn't require that. Your Honor, this issue wasn't brief, but I don't think I'm willing to stipulate at this point before going back to the jury instructions that they do not cover this issue. I thought I had them. But Your Honor, on the obstruction of justice counts, thank you for raising those. There's a series of arguments. Before we get to that though, if I'm right, and I may well be wrong, right? And I'll accept that. If I'm right, how does that affect our review? If in essence, you're arguing the jury could not have found that it was a known official proceeding, but the jury instructions don't require that the jury make that finding. Doesn't that make it difficult for us to address your Rule 29 argument? Respectfully, not at all, Your Honor, because the standards of the sufficiency of the evidence. Luckily, we don't need to peer into the minds of the jurors because we could look at the evidence presented by the government's case. And your position is that you don't waive it by not asking the jury to make the determination. Your Honor, we did ask the jury. The closing statements are in the record. We did ask the jury to make the determination that because Mr. Young could not have known of any, and no evidence was presented that Mr. Young was aware of a grand jury investigation into himself until August of 2016, there is insufficient evidence to prove that he obstructed justice in October of 2014 and December of 2015. Pardon me, November of 2014 and December of 2015. But there's a series of other facts that indicate there's insufficient evidence in those arguments. First, the government, there was no evidence presented that Mr. Young knew he was under grand jury investigation. There was no crime, a substantive crime, alleged before August of 2016 that he could have unknowingly obstructed. The standard is whether it was reasonably foreseeable, correct? That is correct, Your Honor. And precisely because there was no substantive offense that was alleged before August 2016, there's no reasonably foreseeable grand jury for Mr. Young to obstruct. Then there's another series of facts. The government's allegation in count four was that in November of 2014, Mr. Young sent a text message to the informant Mo saying, have a nice vacation. The suggestion was that this was designed to cover up in some potential grand jury investigation that Mr. Young knew one of his associates had gone to join ISIS in Syria. But if you look at the government's evidence in this case, cited in our brief, it shows that Mr. Young did not even become aware that his associate had putatively traveled to Syria until the following month. The evidence in the case also showed that Mr. Young was told that Mo might not actually go on from Turkey to Syria. The evidence showed that Mr. Young advised Mo to... Thank you. What about Kahlil's testimony? Didn't Kahlil take it back pretty far in time in saying that your client knew that he was under investigation, or thought he was under investigation? Not knew, but he thought he was under investigation. So why wasn't Kahlil's testimony significant? Your Honor, it's not significant because the standard for obstruction of justice is what is knowledge under the Aguilar standard and Arthur Anderson, knowledge of an official proceeding. The courts are quite clear that this is a narrow definition. This doesn't contemplate paranoia about getting a parking ticket. Right. But he also told Mo that he thought that the FBI was investigating him, didn't he? Once Mo had joined ISIS? Your Honor, to be completely respectful of my client, he was paranoid about being followed by someone or something. But that, Your Honor, there is no decision in this court that it's held that paranoia doesn't constitute knowledge of a secret grand jury investigation. But, Your Honor, I've run out of time. Well, it has to be official proceedings. Does that have to be grand jury investigation? Well, there's, in Section 15, I think it's 1517, there's a list, there's a list, a complete list of the official proceedings. They're formal proceedings, Your Honor, and grand jury is the only one that would reasonably apply to this case. Initially, the government had taken the position that an FBI investigation without a grand jury can constitute an official proceeding. It backtracked. In appeal, it's no longer making that argument. Okay. Mr. Smith, you've got some time left on rebuttals, so we'll hear from Mr. Cromberg. Good morning, Your Honor. Just to clarify a couple of points that were raised by Mr. Smith, Ian Campbell didn't testify that it was a meeting of the British National Party. He said it was a meeting of the British National Party and the National Alliance. The National Alliance, as the testimony at trial showed, is a neo-Nazi organization. So what Ian Campbell testified, and it's in the record at page 972, is that they went to the meeting of the American friends of British National Party and the National Alliance, and on the way out from that meeting at a Thai restaurant, Mr. Young said, the words to the effect of, don't discount the idea of an alliance with the Muslims to combat the Jews, which was the very poster, the graphic that Mr. Young had on his computer with the Mufti of Jerusalem shaking hands with a generic-looking Nazi. With the caption was, Worldwide Association of Nazis and Islamists. But it looked like a World War II propaganda poster, but it also said 1939 to 2004. So it was not a World War II propaganda poster. It was something that was pertinent to what Mr. Young was believing at that day. Mr. Smith said that that was 16 years before the investigation. Well, he also said this was a 10 years before the investigation, and it was 10 years before 2010 when Khalil- As I understand Mr. Smith's argument, I may have misunderstood it. The thrust was that there was not a basis for predisposition evidence before 2010. Does that, how you understand his argument? I'm not sure I understood his argument today, but his argument in the district court was that 2010. And the judge, he denied, Mr. Smith said that Judge Brinkman did not warn him about this. She did. And she said if you bring that Khalil evidence, if you want to say that Khalil's contact constituted a contact with government agent that triggers the date at which predisposition must be measured, she said a lot of this evidence is going to come in if you don't pick that date. From 2010 forward. Right. Whereas if you don't take anything, if you leave Khalil out of the case, and you start with Mo, Mo started in spring of 2014, this case would have been much different because Khalil was the one who testified about the ability to- What's the timeline on Khalil? So Khalil met Young in December 2010. And Khalil socialized with Young until April 2012. There was no contact with government agent between April 2012 until the spring of 2014, when Mo met Young in the course of investigating someone else. Mo interacted with Young from May of 2014 until October 2014. And the way that the characterization that Mr. Smith characterized their interaction is not supported by the record. Young was in fact supportive of Mo's trip to ISIS, and in fact offered to drive him to the airport so that he could go. But can we turn for just a second, I don't want to run out of time on the obstruction charges and maybe not pertinent and maybe just my curiosity, but why 1512 and not 1001? The problem with 1001 judge is that when Young was asked in December 2015, do you know where Mo is? And Young says, No, I have no idea. Uh, well, did he join ISIS? Well, I don't know it's possible. Do you have an email address for him? No. Well, those answers, Young was attempting to mislead the FBI. But those answers were, well, materiality is one question. But the bigger question, I think, were they actually false? Because Young, in fact, did not know where Mo was, because Mo, in fact, was not in Syria. He thought Mo was in Syria, and he attempted to mislead the FBI about it, but Mo was not in Syria. In fact, he did not have an email account for actual Mo. He had an email account for some FBI agent on the other end. So we had a problem with the statements he attempted to mislead, but they were not false, actually false statements for purposes of 1001. So let me ask you the same question that I asked Mr. Smith. Why didn't these jury instructions include the requirements of Aguilar and Arthur Anderson, right? This sort of foreseeability and nexus to sort of use a shorthand that's probably not a good one. Right. No, no, I know what you're talking about. So in fact, there's a reference in the joint appendix, I can't put my finger on the page, where I said, Judge, are we missing an instruction here about foreseeability? And she said, well, let me check. And then she came back and said, I checked, and we decided that we're not going to use it. It's not needed here. Well, it wasn't needed, because the defense argued that the basic issue that Mr. Young, it was not reasonably foreseeable to Mr. Young that there was a grand jury investigation into him. Well, that's crazy. But it wasn't accepted by the jury, but that was the factual issue decided by the jury. Well, but it wasn't really decided by the jury, right? Because the instructions didn't say that the official proceeding must be reasonably foreseeable to him. I mean, it's just sort of an oddity to me. And my question to you is, except, except it doesn't include that. We asked for it, and the judge denied us, but the defense didn't ask for it. My question is, does that affect our review of the Rule 29 motion that they've made in any way? I don't think so. I think it's because the defense argued that it wasn't reasonably foreseeable. We argued that it was reasonably foreseeable. Had the government said, it doesn't matter if it's reasonably foreseeable. If it existed, you're guilty. But neither the defense nor the government argued that. We all argued, we argued it was reasonably foreseeable. The defense argued it was not reasonably foreseeable. I presume you all will take a look at those instructions the next time you do them. But the other question that I've got, and I'm sorry to bother this, but tell me why Aguilar is different from your case. I mean, why doesn't Aguilar, a case where they knew about a grand jury investigation, they make a statement to an FBI agent, the Supreme Court says, yes, but, you know, we don't have evidence that is the natural and probable consequence that the statement of the FBI would be conveyed to the grand jury. So what we have in this case, Judge, is a very unusual... In the course of answering that, you can also answer for both count two and count four, date specific, what's your best evidence that the grand jury proceeding was reasonably foreseeable? So forgive me, it might take a couple of moments here. So Khalil testified back, testified that in 2011, Mr. Young thought he was under investigation because a woman had given classified information, had access to classified information, told him he was under investigation. Now, that does not mean grand jury investigation, but it means he was under investigation. Khalil testified that Young used... And you agree, just a general FBI investigation is not an official proceeding for this statute's purposes? Correct. Correct. And Khalil testified that Young regularly used burner phones. And at trial, Agent Caslin, who's in the courtroom today, the case agent, held up a bag of, I don't know, 20-something phones that were found at Mr. Young's house, and they were in all sorts of names. Khalil said, and testified that in April 2012, when Khalifi was arrested, Mr. Young told Khalil, you know, they're going to come talk to you because they get the phone records. I was in touch with Chesser. When Zachary Chesser was arrested, they came to speak to me. So you should be prepared for the FBI to come to speak to you based on your conversations with Khalifi. Then, when in 2014, with Mo, there was a text messaging where Young says, you know, our pictures are on a wall where they're trying to draw lines together. But Young said, hey, I'm going to send you this text message, you know, a couple weeks after you leave. Don't respond. The reason is that once the FBI figures out that you're gone, they're going to be looking to see who you were in contact with. So they're going to find this text message, and it will make, and I'm paraphrasing here, but it will make it look like I, who was in contact with you, thought you were coming back. Well, the FBI doesn't get text messages. A police officer knows that the FBI doesn't get text messages without a green jury subpoena. No, they get them through search warrants. Of course they do. But Mo, Mo's text message, Mo is in Syria. So there's only two phones here. There's Young's, Young has a phone, and Mo has a phone. Young thinks Mo is in Syria. So the, actually I don't think, how do you get the substance of text messages through a grand jury subpoena? I think you have to have a search warrant. I'm sorry, you're correct. But the way that the FBI would find that Mo, that, that Mo's phone had been in contact with Young's phone would, would not, would be through a subpoena. They would get a subpoena. So they could do it by an admin subpoena. No, you cannot get, you cannot. No. Well, I'm sorry. The admin subpoena, there's no such thing as admin subpoenas for terrorism cases. There are for drug cases, perhaps, but not for terrorism cases. One of the anomalies of the law, but the FBI cannot get, cannot use an admin subpoena. You can use a, it's true, you can use a national security subpoena, which is true. Yes. And you can get it through FISA. But typically the way that the, but the challenge here that you've got, right. And I, I, I see all that, but the challenge is what you're requiring us to say is two steps, right? One is that because of an understanding that even you and I can't really sort of fully talk about, that he should have divined that because they were getting records, that must mean it's grand jury. But then a second step, right? So maybe that, maybe, maybe that works, but let's even assuming you do, you then have to say there's evidence in the record that he believed his false statement to your agent was, that statement itself was going to be conveyed to that grand jury. And that's true. And the reason we have it in, I believe in this case, different from Avalon perhaps, is that in this case, he had seen his friend Chesser get arrested and get convicted in federal court. He had seen his associate Califi get arrested and, and get convicted in federal court. And all of that helps you on the first one, that he knew there was a there. But the problem I've got is the Aguilar point, which is not only do you have to know there's a grand jury investigation about whomever, right? But he had to believe the natural and probable consequences of his making a statement of the FBI agent was that that FBI agent would be called to testify about that before the grand jury. It's a remarkably high standard in Aguilar and we could debate as a matter of first principles, but that's not what we do here. Aguilar himself says the natural and probable consequence had to be known that that agent would take that statement to the grand jury. Right. And, but in this case, because he has seen his own friends and colleagues get charged in federal court, when he spoke to the FBI in December, 2015, he believed there was an investigation into Mo that would end up in a charge against Mo just as it had for we know from what he did in 2014, that he knew that he himself was at risk. So this is your best evidence you're arguing, getting back to Judge Agee's question. So I think the best evidence is... I mean, you're arguing the particulars, but you're saying this is the body of evidence that supports the conviction. Is there anything else? The fact that he sent the text message... Now I'm probably just repeating what you asked, but what takes it to the next step that shows what he said, even if it was false, amounts to an obstruction of justice? So it was an attempt to obstruct. Unlike the 1001 charge, where it has to actually be a false statement for obstruction of justice, it was an attempt. This was an attempt crime. So he attempted in 2014, he attempted to obstruct the FBI into looking at himself. And in 2015, he attempted to obstruct the FBI about looking into Mo and himself, because he didn't want the FBI to know that he himself had advised Mo on how to get through security, on what to bring with him, on how to communicate once he got back to Syria. Or he did not want the FBI to know that he had asked Mo, hey, can you ask your commanders how I can send some money out of the country? I think you guys must have ways of bringing money out of the country. Would your commanders have any advice for me? He did not want the FBI to know that he was in contact, that he thought he was in contact with ISIS to try to bring money out of the country, and that he had been supportive of Mo and helpful to Mo. So what you're going through now goes to count two or count four or four. And that goes to count two. But I would say that count four, the facts of count four support our allegation, our conviction on count two. The sending of that text message is significant evidence that he believed there was going to be an investigation and that his communications with Mo would be found by the FBI eventually. And the process of an investigation of Mo and anyone who supported Mo. Is that responsive to what you mean? Yeah. Okay. I have lots of things I could talk about. But if the court has any questions on any of the many issues that were raised, I'm happy to respond. But otherwise, I think we responded in our brief. And I appreciate your time. Thank you. All right. Thank you very much, Mr. Smith. Your Honors, I just want to quickly cover a couple of subjects that we haven't had the opportunity to address yet. In our briefs, we have argued that there is missing Brady evidence that it was likely destroyed. The background to this information is absolutely critical. About two days before the original trial date, we were given heavily redacted documents that were then put in a skiff. This violated the discovery order in the case, which said that information had to be produced at least five days before trial. To make a long story short, what this evidence ultimately suggested is that initial recordings between the informant Mo and Nicholas Young had either been lost or destroyed. Why is this important information? I think basically concluded that that was illusory. There was no proof of that. Your Honor, in the hearing that Your Honor is referring to, the court said this is significant and then moved on. We asked the court to strike the witnesses, the closest witnesses that would be relevant to this missing information. That request was denied, but a trial was reset for only one week later. The reason it was very difficult to try to cross-check this information and get to the bottom of it within one week is there had been 27 discovery productions in this case. How about that? You got a continuance for the jinx material, right? There was a one-week continuance, Your Honor. And if Your Honor goes back to the record, I specifically asked for more Are you arguing that it was an error just to give you a week as opposed to two weeks? Your Honor, what we are arguing is that there was Brady material that was missing. And why it's Brady material is because these were the initial conversations that Mr. Young had with the informant Mo about ISIS. At trial, one of the witnesses, the informant Mo, gave false testimony, Your Honors. He testified that the first time he made recordings of Mr. Young was in July of 2014. The government produced tapes from May. There were initial discovery letters in this case that indicated there were recordings between May and June when the initial conversations about ISIS were held. They were never produced in the defense. There were FBI memoranda that suggested that whoever in these meetings that were supposedly not recorded but actually were, Mr. Young was represented as supporting Afghan jihadis. Or when you listen to the tape and compare it with the the jihadis. This is powerful evidence that critical evidence was destroyed, Your Honors, and we firmly believe it was destroyed. In the briefs that the government filed, in 66 pages, there's no response to this argument. So you're not just arguing spoilation, you're arguing malfeasance. Your Honor, I don't want to make that representation. I don't want to speculate. What I can tell you is that there's no response to this. Aliens didn't come down and Your Honor, it's possible that there's a good faith explanation. People lose things, or maybe they didn't even exist in the first place, but that's what they said that never existed. But if Your Honor looks at the evidence in this case and looks at the emails that were produced two days before the original trial date, there are two recordings missing. There are four, then there are six. The undercover informant testifies at trial that the first time he made a recording of Mr. Young was July. The government had produced a May recording, Your Honor. He had several times on the stand about whether he had ever violated FBI rules from his handler agent, about when to record and when not to record. The initial conversations about ISIS go to predisposition, Your Honors. The initial conversations about the subject terrorism group in this case. But I'd like to go to Judge Richardson's point about 1001 and obstruction of justice. Judge Richardson put his finger on the issue exactly. This is a 1001 case but failed. Actually, the AUSA in this case told the initial attorney that there was no materiality and no falsehood in these statements. No materiality. These are 1001 statements that are dressed up under Section 1512 to avoid materiality. The government's attorney just represented that certain facts that occurred back in 2010 or 11 proved that Mr. Young had a knowledge of the But setting aside the chronological problems with that argument, the government just made an inaccurate representation to this court. It's in our briefs. The government represented that Mr. Young was friends with Chesser, a terrorism convict, friends with Khalifi. We begged the court to please go back to our briefs and look at the facts represented. There are no facts at trial supporting these positions and conversations with Chesser or Khalifi, which didn't happen, wouldn't in any case establish Mr. Young's mens rea to obstruct justice several years later in an investigation that hadn't even begun. Mr. Young didn't meet the informant Mo until May of 2014. The conversations about Chesser and Khalifi that the government's referring to, those happened in 2010 and 11. Mr. Young was never friends with those people. But in any case, mens rea as to individual A's knowledge of crime acts, of course doesn't show mens rea as to B's knowledge of crime. Why? You can't establish the defendant's mens rea from an unrelated case and an unrelated crime. As Judge Richardson pointed out, there was no evidence Young knew about the intricacies of grand jury subpoenas. He was a police officer in Washington, D.C. who monitored the tolling booths. There was no suggestion, unlike other cases where law enforcement officers are accused of grand jury proceedings, he had no experience in this area. And there was no substantive crime which he would have knowingly obstructed in the 2014-15 period. There's no allegation of a crime he committed whose investigation he would obstruct. All right, Mr. Smith, anything else you want to tell us in summary? On sentencing, Your Honor, if I may, just two very quick thoughts on sentencing. There was, as Your Honor knows, there's a 15-year sentence with 15-year supervised release. However, in addition to not referring to the charged crimes in arriving at the sentence, the judge didn't break down the sentence in terms of the charges. So there was no breakdown in terms of obstruction of justice versus material support for terrorism. So even if only an obstruction, only the obstruction convictions were to be reversed, for example, there isn't any indication from the court how the court sentence arrived at its sentence. So we would ask that the court remand for resentencing on that contingency alone, but at least vacate for resentencing on the basis of the 3553A argument we made that the nature and circumstances of the offense were not referred to. The court relied on protective First Amendment and Second Amendment activities in deciding its sentence. This is an unusual aspect of the case. Rather than referring to gift cards and the obstruction of justice, the court's commentary focused exclusively on Young's lawful ownership of guns and the possession of the illicit and albeit ugly, very ugly materials found in his house. Those are protected activities. So in addition to not being charged crimes, not being the nature and circumstances of the offense, those are activities that the Constitution protects. And in addition, to make it more paradoxical, those are materials that the judge had initially excluded from trial as being unfairly prejudicial. The court had initially found that because this is a non-violent case, it would be highly unfair to show the jury evidence of guns and body armor with the implication that that's what he was playing. I think you touched on that in your opening. But Your Honor, that same information that the judge had initially excluded as unfairly prejudicial then became the basis for the sentence. Your Honors. Thank you very much, Mr. Smith. We'll come down and greet counsel and take a very brief recess before we take up our last case.
judges: G. Steven Agee, Barbara Milano Keenan, Julius N. Richardson